Irving **MILLER**, Plaintiff,

v.

Milton **STEINBACH** et al., Defendants.

No. 66 Civ. 356.

United States District Court
S. D. New York.

April 3, 1967.

Kaufman, Taylor, Kimmel & Miller, New York City, Stanley L. Kaufman and Shephard S. Miller, New York City, of counsel, for plaintiff Miller.

White & Case, New York City, Thomas Kiernan and Michael S. Mathews, New York City, of counsel, for defendant Evans.

Sullivan & Cromwell, New York City, Morgan, Lewis & Bockius, Philadelphia, Pa., Arthur H. Dean, Robert MacCrate, Thomas E. Patton, New York City, of counsel, for all other defendants.

## OPINION

TENNEY, District Judge.

In this action which has been brought derivatively on behalf and for the benefit of Baldwin-Lima-Hamilton Corporation (hereinafter referred to as "BLH"), individually on plaintiff's own behalf

and representatively on behalf of all former BLH shareholders similarly situated with plaintiff except for those shareholders who participated in the transactions complained of, defendants have moved for an order: (a) under Rules 9(a) and 12(b) of the Federal Rules of Civil Procedure striking all matter from the complaint purporting to state a claim derivately on behalf of BLH; (b) under Rule 12(b) (6) of said Rules dismissing the complaint (or granting summary judgment pursuant to Rule 56) for failure to state a claim on which relief can be granted; (c) transferring this action, pursuant to 28 U.S.C. § 1404(a) (1964) to the United States District Court for the Eastern District of Pennsylvania if any matters remain for determination after (a) and (b) have been resolved; and (d) compelling plaintiff, pursuant to Rule 19(a) of the Federal Rules of Civil Procedure, to join as an indispensable party one Nathan Saks who is alleged by plaintiff (plaintiff's affidavit of June 21, 1966; see Exhibit A to White affidavit of April 25, 1966) to have been the joint owner with plaintiff of the shares upon which he bases his standing to sue, and if plaintiff fails to join this additional party, to dismiss the complaint under Rule 12(b) (3). The purpose of plaintiff's action is to recover damages for a merger between BLH and Armour & Company (hereinafter referred to as "Armour") which was consummated in July, 1965, and which plaintiff contends was in violation of the Federal Securities Laws and was "unfair".

Plaintiff was the joint owner with Nathan Saks of BLH shares since October 5, 1960 (Miller affidavit of June 21, 1966; cf. Complt. ¶ 3) until the 1965 merger at which time his shares were exchanged for Armour securities as will be more fully developed infra. The defendant Armour is a corporation organized and existing under the laws of the State of Delaware. It is authorized to do business and does business in the State of New York.[1] Defendant William Wood Prince was a director of BLH and a member of its executive committee, chairman of the Armour board of Directors, Armour's president, and a member of said defendant's executive committee (Complt. ¶¶ 4, 5). The defendant George A. Rentschler was a director of BLH and chairman of its executive committee as well as a member of the Armour executive committee (Complt. ¶¶ 4, 6). The defendant Milton Steinbach was similarly a director of BLH, a member of the executive committees of both BLH and Armour and was also a partner in Wertheim & Company (hereinafter referred to as "Wertheim") which company's alleged role in the "conspiracy" will be discussed more fully hereinafter (Complt. ¶¶ 4, 7). The defendant Francis L. Elmendorf, another director of BLH, was a limited partner of and consultant to Wertheim and a director of International Packers Ltd. (hereinafter referred to as "Packers") a company in which Armour has a substantial financial interest (Complt. ¶¶ 4, 8). The defendants Perry A. White, James M. White and Andrew Liston, directors of BLH, were president and vice presidents, respectively, of that corporation (Complt. ¶¶ 4, 9). Arthur Littleton, named as a defendant in the within action, was both a director of BLH and a member of the Law firm of Morgan, Lewis and Bockius, Esqs., counsel to BLH (Complt. ¶¶ 4, 10).

The defendant Goldman, Sachs & Company (hereinafter referred to as "Goldman, Sachs") is a New York partnership engaged in investment banking in the State of New York which allegedly took part in the transactions complained of (Complt. ¶ 11). Wertheim plays a substantially similar role to that of Goldman, Sachs (Complt. ¶ 12). All other defendants, with the exception of T. M.

---

[1]. The common stock of Armour is traded on the New York Stock Exchange (Complt. ¶ 2). The BLH common stock was also traded on the New York Stock Exchange prior to the merger (Complt. ¶ 1).

Evans,[2] were directors of BLH. The relationship of Evans to the transactions will also be examined infra.

Plaintiff alleges that on or about February 1, 1965, the defendants Prince, Rentschler, Steinbach, Perry A. White and Armour entered into negotiations looking toward the eventual merger of BLH into Armour (Complt. ¶ 16).[3] Wertheim took part in these negotiations and acted as financial adviser to both parties.[4] The merger plan envisioned a conversion of BLH common stock into a fractional share of Armour common stock and a fractional share of a preferred stock with a par value of $100. This preferred stock was to be traded for the first time on the New York Stock Exchange immediately after the consummation of the merger.

On April 1, 1965, a merger was approved in principle by the board of directors of BLH. Under this agreement, each share of BLH would be converted into one-sixth ($\frac{1}{6}$) share of Armour common stock then selling at $47.00 and $\frac{13}{100}$ share of Armour $4.75 preferred.[5] Prior to this date, the defendant Goldman, Sachs was consulted by both corporations for the purpose of rendering an opinion as to the fairness of the merger. An oral opinion was obtained wherein Goldman, Sachs stated that if the dividend rate were fixed at $4.75—rather than the $4.65 dividend originally proposed—the exchange would be fair and the preferred stock would sell at par.[6] Said opinion was reduced to writing in a letter of April 14, 1965, wherein Goldman, Sachs stated "we are of the opinion that the proposed terms of conversion are fair and equitable to the stockholders of both Armour and Company and Baldwin-Lima-Hamilton Corporation." (Exhibit L to White affidavit of April 25, 1966). No statement was therein made about the future market price of

---

2. Of course, BLH is named as a defendant. However, plaintiff alleges that service on BLH may be impossible because it "may no longer exist as a corporate entity" by reason of the merger (Complt. ¶ 56).

3. In prior litigation involving substantially the same parties and the same transactions, Chief Judge Clary of the Eastern District of Pennsylvania determined that the original discussions (not negotiations per se) were between Prince and Rentschler in late January or early February, 1965, while both men were vacationing in Mississippi. In Chief Judge Clary's statement of facts, Steinbach did not enter the discussions until February 24, 1965. At that time, the three decided that counsel should be consulted and that Steinbach should act as financial adviser if counsel approved. Prince and Rentschler, members of both corporations' executive committees, decided to refrain from any participation in subsequent negotiations except for the final ones. At this time, Perry A. White was designated by Rentschler to serve as BLH's negotiator if the merger was deemed feasible. Prince designated one Edward McAdams to serve as White's counterpart on behalf of Armour. Counsel chosen by the parties advised Steinbach that the merger terms would have to be approved by an independent investment banking firm because of Steinbach's suspect position as an executive committee member of both corporations. Evans v. Armour & Co., 241 F. Supp. 705, 707 (E.D.Pa.1965). As will be set forth infra, because of different burdens of proof the Pennsylvania decision is of no probative value herein.

4. Wertheim received a fee of $120,000 for its participation in the negotiations. Plaintiff alleges that the fee was contingent upon the successful conclusion of the merger. Although the $120,000 amount is mentioned in the opinion of Chief Judge Clary, no note is made of its contingency. Evans v. Armour & Co., supra at 712.

5. The preliminary negotiations had led to a tentative proposal of $\frac{1}{6}$ share of Armour common and $\frac{1}{8}$ share of the preferred. Thus the final proposal was more favorable to BLH in the approximate amount of $2,000,000. However, White had proposed the issuance of a convertible preferred by Armour rather than the straight preferred stock. McAdams, on behalf of Armour, adamantly opposed this proposition and it was eventually dropped. Evans v. Armour & Co., supra at 708.

6. Ibid.

the preferred stock.[7] On April 20, 1965, the boards of directors of both Armour and BLH formally approved the merger. Pursuant to this action of the boards, a detailed proxy statement was prepared and filed purportedly in accordance with the rules of the Securities and Exchange Commission (White affidavit of April 25, 1966 at ¶ 11). The statement was mailed to the shareholders of BLH accompanied by a letter from Perry A. White, BLH president, in which he described the merger, urged a careful reading of the proxy statement and characterized Armour's record as "impressive" over the last five to six years.[8] The proxy statement noted that a special meeting of shareholders would be held on June 10, 1965 to vote on the proposed merger.

### The Evans Action

On May 13, 1965, defendant T. M. Evans, a shareholder of BLH with holdings of approximately 89,000 shares,[9] commenced a shareholder's derivative action in the United States District Court for the Eastern District of Pennsylvania. All the defendants named herein were similarly named as defendants in the Evans action except for Goldman, Sachs,[10] Wertheim and, of course, Evans. The action was brought on behalf and for the benefit of BLH and its shareholders and sought compensatory damages of not less than $25 million and punitive damages in a like amount because of the proposed merger. The gravamen of Evans' complaint was that the defendants had conspired to defraud the BLH shareholders and had vio-

7. In ¶ 22 of the Complaint, plaintiff alleges that Goldman, Sachs was to report on the fairness of the proposed merger "and in particular the value of the Armour securities to be issued pursuant to said merger." The letter of April 14, 1965 would appear to belie plaintiff's contention since no specific mention was made of the value of the Armour package. However, this can in no way mean that an opinion was not given orally with respect to the value of the Armour securities at an earlier date.

8. A copy of the White letter is annexed as Exhibit A to this opinion.

9. The total amount of shares held by Evans raises a confusing question since Evans was highly active in trading his BLH shares. In the Pennsylvania action, Chief Judge Clary stated that the proof adduced at a hearing indicated that Evans owned 46,000 shares. Evans v. Armour & Co., supra at 707. The instant complaint alleges that Evans owned approximately 100,000 shares (¶ 44). In answers to interrogatories propounded by plaintiff, defendant Evans stated that his holdings in BLH varied from March 31, 1965 to June 24, 1965. On March 31, 1965, Evans states that he owned 47,800 shares in his own name and that Evans Production Corporation owned 72,400 shares for a total of 120,200 shares. This represents the greatest quantity of BLH shares owned by him during the period in question. On June 24, 1965, Evans, according to his answers to the interrogatories. owned 25,-

700 BLH shares in his own name and 63,400 shares were owned by Evans Production Corporation for a total of 89,100 shares, which represents Evans' smallest holdings during the period in question (Defendant Evans' Answers to Interrogatories (Second Series) Propounded, at ¶ 19, July 8, 1966). During the two-week period from June 10 to June 24, Evans disposed of 20,100 shares held in his own name. Ibid. The 89,100 shares claimed to be held as of June 24, 1965 agrees with the amount mentioned in the release executed by Evans on September 30, 1965. Exhibit I to White affidavit of April 25, 1966. Further, the 46,000 figure mentioned by Chief Judge Clary, supra, would almost coincide with the 45,800 shares Evans claims to have held in his own name during the period from May 3 to June 10, 1965.

Evans Production Corporation was a New York corporation of which the defendant Evans was the beneficial owner of all save one of the outstanding shares. Evans was chief executive officer and president of said corporation. Evans' Answers to Interrogatories (Second Series) Propounded, at ¶¶ 5, 8, 9, 11, 14.

10. Although Goldman, Sachs was not named as a defendant in the Pennsylvania action, one Schrader, senior partner in said firm, testified therein. The Pennsylvania Court was "greatly impressed" with his testimony. Evans v. Armour & Co., supra at 712.

lated and breached their fiduciary duties to the shareholders for their own personal interests. In addition, Evans alleged that the proxy statement contained false and misleading statements in violation of the Federal Securities Laws. Depositions of fifteen of the defendants were taken in Philadelphia during the week of May 24, 1965 (White affidavit of April 25, 1966 at ¶ 13).

On May 19, 1965, Evans attended a special BLH board of directors' meeting in Philadelphia wherein he was permitted to present his objections to the proposed merger. The BLH board, after considering Evans' position, ratified and reaffirmed the previous approval of the proposed merger. Id. at ¶ 15. On May 21, 1965, following filing of a proposed letter with the Securities and Exchange Commission, Perry A. White wrote to the BLH shareholders informing them *inter alia* of the institution of the Evans action and advising them of the reaffirmance of the merger agreement hereinbefore discussed.[11] Id. at ¶ 16.

On May 25, 1965, Evans sought a temporary injunction enjoining the meeting of BLH shareholders scheduled for June 10, 1965. The motion was set down for a hearing to commence on June 1, 1965 after plaintiff had completed his discovery. The hearing began on that date and was concluded on June 4, 1965 with Chief Judge Clary of the United States District Court for the Eastern District of Pennsylvania reserving decision.[12] On June 8, 1965, Evans' motion for a preliminary injunction was denied, the Court stating that "plaintiff herein has not established fraud, violation of the Securities and Exchange Commission regulations, breach of fiduciary duty, or conflict in interest, which would warrant

this Court in entering a preliminary injunction." Evans v. Armour & Co., 241 F.Supp. 705, 715 (E.D.Pa.1965). Following Chief Judge Clary's determination and on that same day, Evans filed written objection to the plan of merger asserting his right as a dissenting shareholder pursuant to the Pennsylvania Business Corporation Law §§ 908, 515, 15 Purd.Stat. §§ 2852–908, 2852–515 (Supp.1966).

On June 10, 1965, the BLH shareholders approved the proposed merger and similar action was taken by the Armour shareholders on the next day.

Evans, following the procedures provided by the abovementioned sections of the Pennsylvania Business Corporation Law, on June 24, 1965, made written demand for payment of the fair value of his shares as of the date prior to the shareholder approval of the disputed merger—June 9, 1965 (Exhibit G to White affidavit of April 25, 1966).

On July 2, 1965, the merger was consummated. In all, twenty-nine shareholders of BLH with aggregate holdings of 114,535 shares (including the Evans shares) [13] dissented pursuant to the Pennsylvania statute.

### The Berzin Action [14]

Milton Berzin, who had owned 3,900 shares of BLH stock, commenced a derivative action in the District Court in this district on August 27, 1965. Berzin v. Armour & Co., 65 Civ. 2604, S.D. N.Y.1965. Berzin had not dissented to the merger. Named as defendants in the Berzin action were all the defendants sued in the instant case with the exception of Evans. The complaint charged defendants, as here, with conspiring to violate the Securities Act of 1933 and the

11. A copy of this letter is annexed as Exhibit B to this opinion.

12. The transcript of the hearing contains 707 pages of testimony and argument. In addition, Chief Judge Clary had to consider countless exhibits and close to 700 pages of oral depositions.

13. It does not appear that the shares owned by one Milton Berzin were included in this

figure. Berzin's role in the instant action will be discussed shortly. See Kaufman Affidavit ¶ 34.

14. The name "Berzin" appears for the first time in plaintiff's answering memorandum. It is not mentioned in the complaint since plaintiff's counsel alleges that it came to his attention only after the present motions were made. Kaufman Affidavit ¶ 36.

Securities Exchange Act of 1934 for the purpose of merging BLH into Armour on terms favorable to the latter and for the individual defendants' own personal benefit. Berzin also alleged that the proxy statement was inadequate for reasons not relevant herein.

### Settlement of the Various Claims.

Pursuant to § 515(D) of the Pennsylvania Business Corporation Law, 15 Purd.Stat. § 2852–515(D) (Supp.1966), Armour, as successor to the BLH obligations, sent a notice and offer to all 29 dissenting shareholders offering to pay them $17.50 per share—the closing market price of BLH on June 9, 1965.[15] This offer was accepted by two shareholders. One dissenter made a counteroffer of $18.50 per share which was accepted by Armour. Said corporation then wrote to the 26 remaining dissenters making an increased offer of $18.50 per share which was accepted by five additional dissenters.[16] (White affidavit of April 25, 1966 at ¶¶ 26–28.) From July to October 1965, Armour settled with all the remaining dissenters who had perfected their appraisal rights under the Pennsylvania statute. The settlements reached were as follows:

> 2 dissenters settled for $17.50 per share.
> 6 " " " 18.50 " "
> 12 " " " 22.00 " "
> 2 " " " 22.10 " "
> 2 " " " 22.16 " "
> 1 " " " 22.51 " " [17]
> 3 " " " 24.00 " "
> 1 " " " 25.89 " "

Id. at ¶ 34.

### Settlement of the Evans and Berzin Claims

During August and September 1965, negotiations ensued between Armour and Evans with Armour eventually making an oral offer to Evans of $22.00 per share. Under § 515(F) of the Pennsylvania Business Corporation Law, 15 Purd.Stat. § 2852–515(F) (Supp.1966), "a dissenting shareholder who is unable to agree with the corporation on the fair value of his shares may demand proceedings to value his shares at any time after sixty days and within ninety days after the date on which the plan became effective." Therefore, negotiators of a

---

15. No notice and offer was sent to Berzin. Counsel for defendant Armour stated on oral argument before this Court that Berzin wrote to BLH "that he reserved his rights as a dissenter" which is not strict compliance with the Pennsylvania Business Corporation Law. Transcript of June 22, 1966 hearing, at 26. According to counsel, however, Berzin was eventually treated as a dissenter. Ibid.

16. The offers to dissenters are specifically authorized by § 515(D) of the Pennsylvania Business Corporation Law, 15 Purd.Stat. § 2852–515(D) (Supp.1966) which provides in pertinent part:

> Within thirty days after such plan became effective, the corporation or in the case of a merger or consolidation, the surviving or new corporation * * * shall give written notice thereof to each dissenting shareholder * * * and shall make a written offer to each such shareholder to pay for such shares at a specified price deemed by such corporation to be the fair value thereof. * * *

17. This figure represents the amount of the settlement with the defendant Evans. Berzin, although not listed as a dissenter (see n. 15 supra), settled for $22.00 per share. The settlements with Evans and Berzin will be more fully examined infra.

Plaintiff alleges that the price per share of the settlement with Evans was $22.54 rather than the figure set forth in the accompanying text. Kaufman Affidavit ¶ 33.

settlement were faced with a problem of the time running out in which Evans could seek court valuation proceedings if an agreement with the corporation could not be reached.

On September 29, 1965, Armour agreed to pay Evans $22.51 per share in settlement of his claim as a dissenter and Evans agreed to dismissal of the action he had brought. This, of course, was conditioned on approval of the Pennsylvania court. Evans, on September 30, 1965, surrendered 89,100 BLH shares to Armour, executed a release to Armour, and delivered a release and covenant not to sue to the defendant directors.

I am informed by counsel for Armour that Berzin made himself a part of the Evans negotiations, was treated as a dissenter in the same manner as Evans and received a substantially similar price for his BLH shares (Transcript of June 22, 1966 hearing, at 26). It also appears that in these negotiations Berzin was represented by the same Pennsylvania counsel as Evans (see Exhibit J to White affidavit of April 25, 1966). The only difference in the treatment accorded them was that the Evans action was to be dismissed with prejudice while the Berzin dismissal was to be without prejudice. *Ibid.*

On September 29, 1965, a stipulation providing for the dismissal of the Evans action was presented to Chief Judge Clary, who, on the following day, ordered said action dismissed with prejudice, found the settlement to be "fair and just and in the best interests of all interested parties" and required that no notice of settlement "be given to any person other than the parties of record to the proceeding." (Exhibit K to White affidavit of April 25, 1966.) Similarly, on September 30, 1965, a stipulation was presented to Judge Tyler of this Court for signature on the ground that Berzin had failed to comply with Rule 23(b) of the Federal Rules of Civil Procedure which required verification of the complaint in a shareholders' derivative action.[18] Judge Tyler ordered the action dismissed without prejudice on that date with no provision made for notice to shareholders.

### Plaintiff's Allegations

Plaintiff's verified complaint contains two causes of action. The gravamen of the first cause of action is that defendants engaged in a plan and conspiracy to consummate a merger of BLH into Armour to the damage of BLH and its shareholders in violation of the Securities Exchange Act of 1934 and the Securities Act of 1933. Plaintiff contends that the conspiracy was implemented by means of a false and misleading proxy statement and other fraudulent, manipulative and deceptive devices, including the "buying off" of Evans and Berzin. It is alleged in the second cause of action that Evans, in instituting a derivative action became a fiduciary of BLH and its shareholders (Complt. ¶ 68), and that he committed a breach of trust by preferring himself to the other shareholders in negotiating a settlement. It is further contended that the consideration paid to BLH by Armour was inadequate in an amount of at least $11,603,-312.00 (Complt. ¶¶ 76, 79).

More specifically, plaintiff claims that the merger negotiations in February and March, 1965, took place during the course of a distribution of Armour stock and as such violated Section 10 of the Securities Exchange Act of 1934, 48 Stat. 891 (1934), 15 U.S.C. § 78j (1964) and Rule 10b–6 promulgated pursuant thereto (17 C.F.R. § 240.10b–6). In addition, it is alleged that the proxy statement and the accompanying letter of defendant Perry A. White contained statements which were false and misleading with respect to material facts and omitted to state material facts necessary therein to the detriment of BLH and its shareholders in violation of Section 14(a) of the Securities Exchange Act of 1934, 78 Stat.

18. The substance of Rule 23(b) is now contained in Rule 23.1 which has carried over the requirement of verification of the complaint in a shareholder's derivative action.

569 (1964), as amended, 15 U.S.C. § 78n (a) (1964) and Rule 14a–9 promulgated pursuant thereto (17 C.F.R. § 240.14a–9).[19] Plaintiff, in his counsel's answering memorandum, for the first time alleges that Rule 10b–5 (17 C.F.R. § 240.-10b–5) has been violated. No reference whatsoever has been made to this Rule in the complaint. Finally, it is claimed that the Evans action was improperly discontinued without notice to shareholders.

### Grounds for Defendants' Motions

Counsel for defendant Evans argue that (1) plaintiff lost his capacity to sue derivatively on behalf of BLH when the merger was approved; (2) plaintiff has failed to state a claim upon which relief can be granted since Evans had no choice to continue his suit under Pennsylvania law once he had sought appraisal; (3) plaintiff's action is barred by the doctrine of res judicata since another action commenced by a BLH shareholder against Evans had been dismissed for lack of standing to sue (Sonnenschein v. Evans, 155 N.Y.L.J. 16 (N.Y.Sup.Ct. April 21, 1966)); and (4) plaintiff has failed to join an indispensable party.

Counsel for all other defendants join in Evans' point (1), and further argue that since plaintiff did not elect to dissent to the merger but exchanged his BLH shares for Armour shares, he cannot now object to the terms of the merger; that plaintiff fails to allege any material omission from the May 1965 proxy statement; and that if any matter remains for determination, the action should be transferred to the Eastern District of Pennsylvania since all prior proceedings were held there, BLH was incorporated there, and most parties, witnesses and relevant documents are to be found there.[20]

### Plaintiff's Capacity to Sue Derivatively

Defendants argue that plaintiff has no capacity to sue derivatively on behalf of BLH because BLH is no longer in existence. It is contended that Pennsylvania law applies in determining the capacity of the corporation to have brought suit (and, a fortiori, the capacity of the shareholders to likewise sue on behalf of the corporation) since BLH was a Pennsylvania corporation, and under the applicable Pennsylvania law, BLH ceased to exist as a corporate entity upon the consummation of the merger. Accordingly, defendants maintain that since BLH is no longer in existence, there is no corporation on whose behalf plaintiff can sue or who can receive any recovery.

Section 907 of the Pennsylvania Business Corporation Law, 15 Purd.Stat. § 2852–907 (Supp.1966) provides in part: "The separate existence of all corporations parties to the plan of merger or consolidation shall cease, except that of the surviving corporation, in the case of a merger." It is apparent that this portion of the statute merely codifies the Pennsylvania common law as promulgated in Lauman v. Lebanon Valley R. R., 30 Pa. 42 (1858), wherein the Pennsylvania Supreme Court stated that when the merger is consummated, the merged company "loses its actual identity, abandons its name and therefore its legal identity and its corporate existence, and can no longer claim any legal recognition." Id. at 45; see Pennsylvania Util. Co. v. Public Serv. Comm'n, 69 Pa.Super. 612, 619–620 (1918); National Dairy Prods. Corp. v. Gleeson, 16 Pa.Dist. &

---

19. The specific misstatements or omissions alleged will be set forth infra.

20. Counsel for these defendants have placed the Court in a difficult position. If I were to determine the within motions adversely in part to defendants and then were disposed to change venue, it would appear that I would be adjudicating matter more properly to be decided by the Pennsylvania court. However, if I were to reach the issue of venue first and order the case transferred to Pennsylvania, the wording of defendants' motion would make it appear that the issue of venue is wrongfully being raised at this point on the Court's own motion. However, in light of the finding made infra that plaintiff's choice of venue will not be disturbed, the problem has been avoided.

Co.R.2d 390, 72 Dauph. 112 (Pa. Commonwealth Ct.1958).

Defendants contend that on the authority of Braasch v. Goldschmidt, 41 Del.Ch. 519, 199 A.2d 760 (1964) and Arnstein v. Bethlehem Steel Corp., 18 F.Supp. 916 (E.D.N.Y.1937), once the merger has taken place, any derivative rights passed to the surviving corporation, and the old corporation itself would be barred from bringing suit and, therefore, its shareholders could not sue derivatively. I believe that under the facts presented in the case at bar, *Braasch* and *Arnstein* should not be applied and this conclusion is reached for two reasons:

■ First, the shareholder's derivative action is usually considered to be an action in equity. Koster v. (American) Lumbermens Mut. Cas. Co., 330 U.S. 518, 519, 67 S.Ct. 828, 91 L.Ed. 1067 (1947); Andrews v. Drake, 83 F.2d 767, 773 (6th Cir.) cert. denied, 299 U.S. 572, 57 S.Ct. 35, 81 L.Ed. 421 (1936); 13 Fletcher, Private Corporations § 5990 (rev. vol. 1961). It would appear to me that a grossly inequitable decision would

be reached if I were to hold that a merged corporation and/or its shareholders are barred from suing where the very merger itself took place because of the allegedly wrongful activities of the directors of the old corporation and the management of the surviving corporation among others. Cf. May v. Midwest Ref. Co., 121 F.2d 431 (1st Cir.), cert. denied, 314 U.S. 668, 62 S.Ct. 129, 86 L.Ed. 534 (1941). To hold that the surviving corporation inherits a derivative right of action where said corporation has wrongfully taken part in the very acts complained of would be to reach an incongruous and highly inequitable result. Defendants in their extremely thorough memoranda have failed to cite one decision of a Pennsylvania court where such an anamolous result was reached.

■ However, without pursuing the equities involved any more thoroughly, I think the second reason is dispositive of the issue of plaintiff's derivative standing with respect to the first cause of action.[21] Defendants' basic premise is that since BLH was organized and ex-

---

21. As to the second cause of action, jurisdiction is based solely on diversity of citizenship. This claim is addressed only to the actions of the defendants Evans and Armour. It would appear from the authorities previously cited that plaintiff's capacity to sue would be governed by Pennsylvania law. However, not one Pennsylvania case has been cited to me which would indicate that in an action containing the allegations of the case at bar, the Pennsylvania courts would determine that plaintiff lacks capacity to sue. In none of the Pennsylvania cases cited by defendants (Lauman v. Lebanon Valley R.R., 30 Pa. 42 (1858); Pennsylvania Util. Co. v. Public Serv. Comm'n, 69 Pa.Super. 612 (1918); National Dairy Prods. Corp. v. Gleeson, 16 Pa.Dist. & Co. R.2d 390, 72 Dauph. 112 (1958)) did the surviving corporation take part in the alleged wrongful acts.

Similarly, in Arnstein v. Bethlehem Steel Corp., 18 F.Supp. 916 (E.D.N.Y.1937), the wrong complained of was that of the directors of the old corporation. In such a case, it would not be inequitable to have the rights pass to the surviving corporation since it would appear that said corporation entered and took part in the transaction with clean hands.

The case of Braasch v. Goldschmidt, 41 Del.Ch. 519, 199 A.2d 760 (1964) presents a problem because it is unclear from a reading thereof whether it can be stated with any certainty that the surviving corporation took part in wrongful acts. If it did, it would appear that the decision would be questionable in that it would allow suit to be brought derivatively on behalf of the surviving corporation (which would mean a recovery by the wrongdoer) rather than allowing suit on behalf of the wronged corporation. Compare Voege v. American Sumatra Tobacco Corp., 241 F.Supp. 369 (D.Del.1965). In that case, a complaint was filed based upon the same transaction as in *Braasch*. The district court stated that no decision need be reached "whether under federal law the merger of Old Company into New Company is a bar to the assertion of a derivative right of action on behalf of Old Company, despite such effect being accorded to the merger under Delaware law * * *." 241 F.Supp. at 376.

The problem I face is somewhat different since the precise issue passed upon in Delaware has never been decided in Pennsylvania.

isted under the Pennsylvania Corporation Law and had its corporate offices in Philadelphia, Pennsylvania law governs its corporate existence and its capacity to sue on the authority of Lowell Wiper Supply Co. v. Helen Shop, Inc., 235 F.Supp. 640, 643 (S.D.N.Y.1964) (status of stockholder to bring derivative action under Fed.R.Civ.P. determined by law of state of incorporation) and Hausman v. Buckley, 299 F.2d 696, 702, 93 A.L.R.2d 1340 (2d Cir.), cert. denied, 369 U.S. 885, 82 S.Ct. 1157, 8 L.Ed.2d 286 (1962).[22] Defendants then contend that under the applicable Pennsylvania law, plaintiff lacks capacity to sue derivatively. Both the *Lowell Wiper* case and the *Hausman* case involved Federal suits wherein jurisdiction was founded upon diversity of citizenship rather than upon violations of the Federal securities laws.

■ However, "where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." Bell v. Hood, 327 U.S. 678, 684, 66 S.Ct. 773, 777, 90 L.Ed. 939 (1946). (Footnote omitted.) Congress has determined that

> "[T]ransactions in securities as commonly conducted upon securities exchanges and over-the-counter markets are affected with a national public interest which makes it necessary to provide for regulation and control of such transactions and of practices and matters related thereto, including transactions by officers, directors, and principal security holders, to require appropriate reports, and to impose requirements necessary to make such regulation and control reasonably complete and effective, in order to protect interstate commerce, the national credit, the Federal taxing power, to protect and make more effective the national banking system and Federal Re-

serve System, and to insure the maintenance of fair and honest markets in such transactions * * *." Securities Exchange Act of 1934, § 2, 48 Stat. 881 (1934), 15 U.S.C. § 78b (1964).

The Federal Courts have a duty to "be alert to provide such remedies as are necessary to make effective the congressional purpose." J. I. Case Co. v. Borak, 377 U.S. 426, 433, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964). Despite a Pennsylvania statute to the contrary (and has been hereinbefore mentioned, it is highly speculative that the law of that state would require such a contrary result), where there is an overriding federal law applicable, that federal law will "control the appropriateness of redress." Id. at 434, 84 S.Ct. 1555. In other words, where an action is based on the federal securities laws, state substantive or procedural laws may not impede the application of the federal statute. Fleischer, "Federal Corporation Law": An Assessment, 78 Harv.L.Rev. 1146, 1168 (1965). However, "Federal law should be deemed to limit the applicability of state laws only when they tend to impede the congressional purpose." Id. at 1170; cf. Eagle v. Horvath, 241 F.Supp. 341, 344–345 (S.D.N.Y.1965) (Herlands, J.). See also Voege v. American Sumatra Tobacco Corp., 241 F. Supp. 369 (D.Del.1965); Kane v. Central Am. Mining & Oil, Inc., 235 F.Supp. 559, 569 (S.D.N.Y.1964). It is clear from the allegations of the instant case that application of Pennsylvania law in such a manner as to deprive a defrauded corporation of its rights under the federal securities laws, would be repugnant to the application of the *Borak* decision, supra. But cf. Rosenfeld v. Schwitzer Corp., 251 F.Supp. 758 (S.D.N.Y.1966).

■ Accordingly, it is my opinion that plaintiff has capacity to sue derivatively on behalf of BLH under the federal securities laws. I reach this conclu-

---

22. See generally Reese & Kaufman, The Law Governing Corporate Affairs: Choice of Law and the Impact of Full Faith and Credit, 58 Colum.L.Rev. 1118, 1125 (1958).

sion in spite of the decisions reached in the older cases which have required the corporation on whose behalf the action is brought to be a party-defendant. E. g., Arnstein v. Bethlehem Steel Corp., supra; see 2 Hornstein, Corporation Law & Practice § 714, at 199 (1959). See generally 13 Fletcher, op. cit. supra at § 5997. However, since BLH is merely a nominal party, Helpern v. Pennsylvania R. R. Co., 189 F.Supp. 494 (E.D. N.Y.1960), and the *Borak* decision requires the Court to mold a remedy for a violation of the federal securities laws, 377 U.S. at 433, 84 S.Ct. 1555, under the facts herein, the failure to serve BLH should not be fatal especially since the recovery in this type of case can go directly to the shareholders of old BLH. Cf. Perlman v. Feldmann, 219 F.2d 173, 178, 50 A.L.R.2d 1134 (2d Cir.), cert. denied 349 U.S. 952, 75 S.Ct. 880, 99 L.Ed. 1277 (1955); Burg v. Horn, 37 F.R.D. 562 (E.D.N.Y.1965); Societe Magnus & Co. v. Einstein, 20 F.R.D. 38, 40 (S.D.N.Y.1956).[23] Compare Vine v. Beneficial Fin. Co., 2d Cir., 374 F.2d 627, March 13, 1967. See generally Grenier, Prorata Recovery by Shareholders on Corporate Causes of Action as a Means of Achieving Corporate Justice, 19 Wash. & Lee L.Rev. 165 (1962); Winer, Jurisdiction Over the Beneficiary Corporation in Stockholders' Suits, 22 Va.L.Rev. 153 (1935); Developments in the Law, Multiparty Litigation in the Federal Courts, 71 Harv.L.Rev. 874, 946–50 (1958); Note, 69 Harv.L.Rev. 1314 (1956).

Accordingly, for the reasons set forth herein, this portion of defendants' motions is denied.

### *Plaintiff's Failure to Dissent to the Merger.*

Defendants, still relying on Pennsylvania law, argue that if plaintiff dis-

agreed in any way with the merger, his sole remedy under Pennsylvania law was to dissent and demand an appraisal of his shares pursuant to §§ 908 and 515 of the Pennsylvania Business Corporation Law, 15 Purd.Stat. §§ 2852–908, 2852–515 (Supp.1966). § 515(B) of said statute provides that "unless a shareholder files such written objection and also makes such demand within the twenty-day period, he shall be conclusively presumed to have consented to the plan, and shall be bound by the terms thereof." Defendants state that the Pennsylvania courts have uniformly held that the remedy of appraisal is the exclusive remedy for those shareholders who disagree with corporate action which allows appraisal. Duddy v. Conshohocken Printing Co., 171 Pa.Super. 140, 90 A.2d 394 (1952); Gerstell v. Allentown Portland Cement Co., 30 Pa.Dist. & Co.R.2d 223, 228 (1963); Newburger, Loeb & Co. v. Baldwin Sec. Corp., 15 Pa.Dist. & Co.R.2d 614 (1958); Block v. Baldwin Locomotive Works, 75 Pa.Dist. & Co.R. 24 (1950). Defendants further rely on Hubbard v. Jones & Laughlin Steel Corp., 42 F.Supp. 432 (W.D.Pa.1941) and Troupiansky v. Henry Disston & Sons, Inc., 151 F.Supp. 609 (E.D.Pa. 1957).

For the same reasons that I have previously found plaintiff had capacity to sue, I find that this contention of defendants is without merit. First, to conclusively bind a corporate shareholder to a plan of merger where that shareholder has been lulled into a false sense of security because of the issuance of a glowing and misleading proxy statement, would be to reach a highly inequitable result, a result not required by the Pennsylvania statute, and as will be demonstrated shortly, a result not warranted by the Pennsylvania

---

**23.** It is interesting to note that in the *Societe Magnus* case, supra, Judge Dimock of this court recognized that in certain circumstances the corporation in whose behalf suit is brought would not be a necessary party to the litigation. This reasoning was based upon the holding of Perlman v. Feldmann, supra. Nevertheless, Judge Dimock held that under the facts presented to him the corporation was a necessary party. Societe Magnus & Co. v. Einstein, supra 20 F.R.D. at 38.

decisions relied on by defendants. Even where a statute by its terms stated that the remedy of appraisal was exclusive, it has been held to relate only to a "good-faith sale" and will not include "a sham sale or legal subterfuge." Weckler v. Valley City Mill. Co., 93 F.Supp. 444, 455–456 (W.D.Mich.1950), aff'd per curiam, 188 F.2d 367 (6th Cir. 1951); cf. Porges v. Vadsco Sales Corp., 27 Del.Ch. 127, 32 A.2d 148 (1943); Cole v. National Cash Credit Ass'n, 18 Del. Ch. 47, 156 A. 183 (1931).

Although the courts interpreting the Pennsylvania statute have echoed the phrase that appraisal is the exclusive remedy under the law of that state, and the cases appear to be correct in the statement as applied to the peculiar facts of each of those cases, it is submitted that the facts of this case require no strict adherence to the doctrine of exclusivity of the appraisal remedy. Thus, in Duddy v. Conshohocken Printing Co., supra, plaintiff, after dissenting, attacked the fairness of the appraisal proceeding. No allegation was made that the dissenter was not fully informed of the proposed corporate action; i. e., nothing more had been claimed than a disagreement with corporate policy. The holding of the Court is solely that a determination by an appraisal court of the fair value of a dissenter's shares will be set aside only for fraud. Id. 171 Pa.Super. at 142–143, 90 A.2d 394. There is no statement in Duddy or in any of the other cases cited by defendants that the appraisal statute would be exclusive where the events leading up to the merger or the merger itself were tainted with fraud.

In Gerstell v. Allentown Portland Cement Co., supra, plaintiff sought to have a merger declared void. The Court held appraisal to be plaintiff's exclusive remedy. The action alleged that the purpose of the merger was to freeze out [24] minority shareholders. In such a situation, especially where the dissenter is aware of all the material facts, courts have concluded "that the minority stockholder may have to settle for cash." Vorenberg, Exclusiveness of the Dissenting Stockholder's Appraisal Right, 77 Harv.L.Rev. 1189, 1204 (1964) (Footnote omitted.); see Blumenthal v. Roosevelt Hotel, Inc., 202 Misc. 988, 115 N.Y.S.2d 52 (1952); Matteson v. Ziebarth, 40 Wash.2d 286, 242 P.2d 1025 (1952). See generally Note, Freezing Out Minority Shareholders, 74 Harv.L.Rev. 1630, 1631 (1961). In Gerstell, supra, there was no showing that the action taken would not have been approved but for fraud on the shareholders. Accordingly, I conclude that in that situation the Court was correct in limiting the dissenter to appraisal.[25]

The case of Newburger, Loeb & Co. v. Baldwin Sec. Corp., supra, stands only for the proposition that a person who does not dissent within the statutory time period will be barred from so doing. The decision does not indicate that the time period will be applied where a plaintiff does not dissent because of a misrepresentation or omission concerning the proposed corporate action.

In Bloch v. Baldwin Locomotive Works, supra, plaintiffs sought to enjoin a

---

24. The broad definition of a "freeze-out" is any action taken by the persons in control of the corporation resulting in termination of a shareholder's interest. The term implies "a *purpose* to force a liquidation or sale of the stockholder's shares, not incident to some other wholesome business goal." Vorenberg, Exclusiveness of the Dissenting Stockholder's Appraisal Right, 77 Harv.L.Rev. 1189, 1192–93 (1964). (Footnote omitted.) See generally O'Neal & Derwin, Expulsion or Oppression of Business Associates 3 (1961).

25. Professor Vorenberg suggests that "only where there is a plausible business purpose of the corporation beyond the majority's desire to enlarge their own stockholdings or to eliminate a minority stockholder should the minority holder be required to choose between what is available to him as a result of the action proposed by the majority and the cash value of his shares." Vorenberg, supra note 24, at 1204.

merger between Baldwin Locomotive Works and Lima-Hamilton Corporation (which merger caused the formation of BLH). The Pennsylvania court found that the injunction would not issue since appraisal was the dissenters' exclusive right. Again, there was no allegation that the transaction was fraudulent and that this was the reason the action had been approved by the shareholders. Plaintiffs had only alleged that they disagreed with the decision of the majority.

Hubbard v. Jones & Laughlin Steel Corp., supra, involved an attempt to void a merger by preferred shareholders on the grounds that recapitalization was unlawful. Before stating that the dissenter's exclusive remedy was the right of appraisal, the Court specifically found the merger fair. Id. 42 F.Supp. at 436. Again, there was no showing of fraud on the shareholders in their approval of the merger. If such a showing had been made, it is submitted that the result might very well have been different.

Finally, Troupiansky v. Henry Disston & Sons, Inc., supra, held that if the merger complied with §§ 901–909 of the Pennsylvania Business Corporation Law, 15 Purd.Stat. §§ 2852–901—2852–909, then § 908, dealing with the dissenter's remedies must be complied with. The case did not in any way deal with the issue of fraud present in the case at bar.

In summary, I think the following statement of Professor Vorenberg would best predict the position that would be taken if a Pennsylvania court were faced with the problem herein:

"*[I]f adequate notice of the transaction has not been given to the stockholders* or if the required number of votes has not been validly cast it seems clear enough that a dissenter ought not to be limited to appraisal. Only when a duly constituted and adequately informed majority has in fact spoken should the minority's right to elect appraisal be permitted to become a shield for the majority's action." Vorenberg, supra at 1209–10. (Emphasis added.) (Footnotes omitted.)

Cf. May v. Midwest Ref. Co., supra; Weckler v. Valley City Mill. Co., supra; MacArthur v. Port of Havana Docks Co., 247 F. 984, 987 (D.Me.1917).

Accordingly, under the facts alleged herein I could not state that Pennsylvania courts would limit plaintiff to his right of appraisal.

■ This discussion has again presupposed the applicability of Pennsylvania law. However, as I noted earlier, it is my considered opinion that federal law would be applicable because of the *Borak* case, supra. In this respect, the language of Judge Herlands of this court in Eagle v. Horvath, supra, is particularly pertinent to the instant case:

Defendant's claim that plaintiff is limited to his right of appraisal under state law and that relief from this court is therefore precluded must be rejected for the two following specific reasons:

First, an action based on alleged violations of section 14(a) of the 1934 Act is essentially a derivative action. J. I. Case Co. v. Borak, 377 U.S. at 432, 84 S.Ct. 1555, 12 L.Ed.2d 423. Thus, whatever limited rights the *individual shareholders* may have under state law, such limitations are quite irrelevant in providing appropriate relief to the injured *corporation*.

Second, as the court said in J. I. Case, at 434, 84 S.Ct. at 1561:

"But we believe that the overriding federal law applicable here would, where the facts required, control the appropriateness of redress despite the provisions of state corporation law, for it 'is not uncommon for federal courts to fashion federal law where federal rights are concerned.' "

Since it is federal law and not state law that governs whatever relief is available to redress violations of the federal securities laws, it is clear that plaintiff, in this essentially derivative action, is not limited to a right of appraisal.

Id. 241 F.Supp. at 344–345.

In Voege v. American Sumatra Tobacco Corp., supra, Judge Steel of the Delaware District Court was faced with the converse situation to the one facing me.[26] There, the Court determined that a violation of federal rights demanded the fashioning of federal law despite the appraisal provisions of Delaware corporate law. Because of defendant's fraud, Judge Steel held that the demand for appraisal by plaintiff was "not an informed choice" since made in ignorance of the defendant's actions and therefore did not constitute an election of remedies which would have barred the action. Id. 241 F.Supp. at 375.

In the case at bar, plaintiff's failure to dissent did not, under federal law, represent an informed choice, and I conclude that notwithstanding an interpretation of the Pennsylvania statute inconsistent with the opinion herein, under federal law plaintiff's failure to dissent does not constitute a bar to his maintaining this action.

### Omissions from or Misrepresentations in the Proxy Statement.

■ Before examining plaintiff's individual allegations, one observation is in order. Defendants make much of the fact that the proxy statement was filed with the Securities and Exchange Commission and examined by its staff. In J. I. Case Co. v. Borak, supra, Mr. Justice Clark noted,

The [Securities and Exchange] Commission advises that it examines over 2,000 proxy statements annually and each of them must necessarily be expedited. Time does not permit an independent examination of the facts set out in the proxy material and this results in the Commission's acceptance of the representations contained there-

in at their face value, unless contrary to other material on file with it.
Id. at 432, 84 S.Ct. at 1560. It is my opinion that this statement thoroughly answers defendants' argument concerning review of the proxy material by the Securities and Exchange Commission.

The gravamen of plaintiff's complaint is that because of so-called stabilization transactions the price of Armour common stock was kept artificially inflated during the period of the negotiations so that once these stabilization transactions were discontinued, the price of Armour common stock fell, consequently causing BLH to receive less consideration than agreed upon at the time of the negotiations. It is alleged that the directors of both Armour and BLH were aware of these transactions. In addition, plaintiff charges that all defendants (excluding, I assume, the defendant Evans) knew that the new preferred stock of Armour which was to be included in the package to be received by the BLH stockholders would not sell at par thus making said package of securities less attractive to the BLH shareholders. Most of the alleged defects in the proxy material relate to these transactions.

### 1. The Value of Armour Stock.

Plaintiff alleges that the proxy statement represented the market price of Armour common stock for the early part of 1965 [27] as ranging between 43¾ and 47⅜ per share which was false and misleading because of an omission from the proxy material of a statement to the effect that certain manipulative devices were employed which could have conceivably kept the market price above that which would prevail in an open market (Complt. ¶ 34(a)).

The facts concerning the so-called manipulative devices are as follows: On February 11, 1965, Armour commenced

---

26. Plaintiff exercised her right of appraisal because of defendant's fraud rather than, as here, failing to exercise dissenter's rights because of misrepresentations.

27. The complaint alleges that these transactions took place during the second

quarter of 1965 (up to May 3, 1965). In plaintiff's opposing memorandum, it is stated that this is in error and that the period encompassing the first quarter of 1965 is the intended period, which period would end on March 31, 1965. Plaintiff's Memorandum in Opposition at 41.

a rights offering of 614,810 shares. According to the defendant Steinbach, said rights offering was to expire by its terms on February 26, 1965 (Steinbach affidavit at ¶ 4). The shareholders of record of Armour common stock were given the right to subscribe to additional shares at $41.50 per share which was somewhat below the prevailing market price of Armour. The Armour shareholders were given one right for each share held, ten rights plus the purchase price being required to purchase each new share. In other words, transferrable warrants representing approximately 6,148,100 rights were issued to the Armour shareholders. The defendant Steinbach in his affidavit unequivocally states that the underwriting group (of which the defendant Wertheim was a part) purchased subscription rights at the beginning and at the end of the offering period but that no purchase of Armour common stock was made during the period of the rights offering. Id. at ¶ 6.[28]

Plaintiff argues that BLH shareholders were entitled to know of the existence of the underwriters' transactions since the price range of Armour common might conceivably have been affected by said transactions. By the underwriters removing a certain number of rights from the market, plaintiff contends that the market price of the rights was stabilized at a price higher than if these rights had remained on the open market. According to plaintiff, the market price of the common stock would have dropped if the rights price had declired. Thus it is plaintiff's contention that the value of the Armour common stock might have been artificially inflated, giving the BLH shareholders a lesser package of Armour securities than might have been received had no dealings in rights been entered into by the underwriters.

Defendants argue that the number of rights purchased by the underwriters was insignificant and could have no influence on the price of the Armour common stock. They further contend that any further information regarding the rights offering was not required and would have been meaningless.

Section 14(a) of the Securities Exchange Act of 1934, 78 Stat. 569 (1964), as amended, 15 U.S.C. § 78n(a) (1964) provides in pertinent part: "It shall be unlawful for any person * * * to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security * * * " which violates rules to be promulgated by the Securities and Exchange Commission. Rule 14a–9 of the Securities and Exchange Commission, 17 C.F.R. § 240.14a–9, provides in pertinent part that no proxy solicitation shall be made which contains a proxy statement which under all the circumstances "is *false or misleading with respect to any material fact, or which omits to state any material fact* necessary in order to make the statements therein not false or misleading * * *." (Emphasis added.) In essence, what the representation or omis-

---

28. The specific transactions which appear to have been taken are as follows: On February 11, 1965, the underwriters purchased 51,461 subscription rights (i. e., the right to purchase approximately 5,146 shares) from an Armour shareholder and from a subscription agent. These were not purchased on any stock exchange. On February 16, 1965, the underwriters sold 9,900 Armour shares to other securities dealers. On February 25 and 26 and March 1 and 2, 1965, the underwriters purchased 81,544 rights which had been held at the conclusion of the distribution.

In all, the underwriters acquired 133,005 rights which were exercised at the conclusion of the rights offering to acquire 13,299 shares of Armour common stock from Armour.

At the close of the rights offering, 14,208 shares had not been subscribed to and these were taken by the underwriters pursuant to the underwriting agreement.

Therefore, on March 2, 1965, the underwriters held 17,607 shares for disposition (13,299 plus 14,208 minus 9,900 shares). These shares were all sold at or below the then current market price plus commission with delivery of the shares being made to the new shareholders on March 9, 1965. Steinbach Affidavit ¶¶ 7–12.

sion must amount to is "one that would influence the stockholder's vote." Evans v. Armour & Co., supra, 241 F.Supp. at 709; see Dunn v. Decca Records, Inc., 120 F.Supp. 1, 2 (S.D.N.Y.1954); 2 Loss, Securities Regulation 917–18 (2d ed. 1961).[29]

The only references to the February rights offering in the proxy statement are as follows:

At page 5, note (b), it is stated "Such number of shares does not include the 614,810 shares issued pursuant to the rights offering in 1965 * * *."

At page 7 in a note to a condensed Armour and BLH balance sheet it is stated that the Armour statement "does not reflect the increase of over $26,000,-000 resulting from the exercise of warrants and the sale of Common Stock in a rights offering * * *."

Finally, at page 42, the proxy statement sets forth that

In March, 1965 Armour completed a rights offering of its Common Stock to stockholders of record on February 11, 1965. Subscriptions were received for a total of 614,810 shares of Common Stock. Net proceeds accruing to Armour aggregated $24,622,954. Common Stock was credited with $3,074,-050, the $5 par value per share issued, and Capital and paid-in surplus with the remaining $21,548,904.

■ As can be seen, no mention whatsoever was made of the underwriters' transactions. I do not think that it can be stated as a matter of law that these transactions need not have been mentioned in the proxy statement even if said transactions were perfectly innocent. Accordingly, at least in this respect, there is a question of fact to be decided at a trial and, on this ground alone, a motion for summary judgment can be denied.[30] Defendants contend that at the time of

the rights offering no negotiations *per se* were taking place and that mere "discussions" were held. However defendants may characterize the talks that were admittedly held in February of 1965, it is clear that something was taking place and just what this "something" was also presents a question of fact. Additionally, defendants' argument that the rights offering could have no effect on the price of the Armour common presents a fact question.

2. *Failure to Reveal the Underwriters' Transactions.*

■ The previous allegation was that false and misleading market price information was given because of the so-called stabilization transactions or manipulative devices. Plaintiff next alleges that the proxy statement failed to state that the merger was negotiated during the course of a distribution of Armour securities and while stabilization transactions were being effected, thus rendering the negotiations in violation of § 10 of the Securities Exchange Act, 48 Stat. 891 (1934), 15 U.S.C. § 78j (1964) and Rule 10b–6, 17 C.F.R. 240.10b–6 promulgated thereunder (Complt. ¶ 34(b)).

While I have found that material questions of fact exist with respect to the progress of the merger at the time of the rights offering and as to the need to have disclosed the underwriters' transactions, I did not determine at that time whether there was any claim stated with respect to a Rule 10b–6 violation. Since, as will be determined hereinafter, plaintiff has sufficiently stated a Rule 10b–6 claim. I find that this allegation also presents an issue of fact as to whether this information should have been included in the proxy statement.

3. *The Value of the Armour Package.*

As has been hereinbefore set forth, each share of BLH common stock was to

29. Defendants do not contend that if what plaintiff contends is true and material there is no causal connection between the misrepresentation or omission and the action taken by BLH. See Barnett v. Anaconda Co., 238 F.Supp. 766 (S.D.N.Y. 1965).

30. At this point, no determination has as yet been reached with respect to the status of the defendants Wertheim, Goldman, Sachs, and Evans. See text accompanying note 36 infra.

be exchanged for ⅛ share of Armour common stock and ¹³⁄₁₀₀ share of a new $4.75 Armour preferred stock having a $100 par value. Plaintiff alleges that the proxy statement was false and misleading in that a reading of a table of comparative data at page 4 of the proxy statement would allow BLH shareholders to infer that each share of BLH common having a market price of $17.50 on March 31, 1965, would be converted into Armour securities worth $20.90. Plaintiff claims that the proxy statement omitted to state that the preferred stock had a value of less than par and that ¹³⁄₁₀₀th share had a value of less than $13.00 [31] (Complt. ¶ 34(c)).

The applicable portion of the comparative data table is set forth as follows:

### BLH STOCKHOLDER

| | | |
|---|---|---|
| Before merger ................. | 1 share of Common Stock ($13 par value) | $17.50 |
| | ⅛th share Common Stock ($5 par value) *pro forma* | |
| After merger ................. | | |
| | ¹³⁄₁₀₀ths share $4.75 Preferred Stock ($100 par value) *pro forma* | Par Value(f) $13.00 |

———◆———

The $7.90 and the $13.00 figures are not totaled while all earnings, dividends and book value columns (not shown above —see Exhibit C to this opinion) are totaled. In footnote (f) to the above table, it is stated that "Inasmuch as none of the $4.75 Preferred Stock was outstanding on March 31, 1965, there was no market price for such stock on that date. For purposes of this comparison, the $4.75 Preferred Stock is included on the basis of its par value." Directly below the comparative data table, it is stated that

"The total of the market value of Armour's Common Stock as of March 31, 1965, plus the *par* value of the $4.75 Preferred Stock, to be issued in the merger, is $87,036,000, or $20,545,-000 less than BLH's net asset value of $107,581,000 at December 31, 1964, which difference is equal to $4.93 per share of BLH Common Stock outstanding as of such date." BLH Proxy Statement, pp. 3–4. (Emphasis added.)

Defendant correctly argues that any attempt to predict the market price of the $4.75 preferred would have constituted a violation of Rule 14a–9. Union Pacific R. R. v. Chicago & N. W. Ry., 226 F.Supp. 400, 409 (N.D.Ill.1964). Indeed, it is difficult to see how the proxy statement could have been any more explicit with regard to the comparison made. It would appear that the only alternative that defendants had was to leave the material out altogether in which case plaintiff would probably have complained of a material omission in the statement.

In order to constitute a violation of Rule 14a–9, the proxy statement must be false and misleading "in light of the circumstances under which it is made." Here, the agreement of merger was made a part of the proxy statement and pointedly makes no reference to the value of the Armour package.

Accordingly, under the above circumstances, I find as a matter of law that the proxy statement did not misrepresent or omit any information with re-

---

31. A copy of the comparative data table is annexed as Exhibit C to this opinion.

spect to the Armour package of securities.

### 4. *Amounts to be Paid to Dissenters.*

■ Plaintiff complains that the proxy statement failed to state that the amounts which would be paid to some dissenting shareholders would exceed the future market prices of the Armour securities to be received by shareholders upon the merger (Complt. ¶ 34(d)). Plaintiff argues that since dissenting shareholders were required to advise BLH of their objections to the merger prior to the shareholders' meeting, this information should have been in the proxy statement. This argument is patently absurd. Not only could BLH or Armour not know the amount that would be paid to dissenters at the time the proxy statement was mailed on May 5, 1965, but it would have been impossible to know if *any* shareholder would even object to the merger. Any attempt to set forth any information in the proxy statement would be a prediction which, as can be seen by the varying amounts paid to the dissenters,[32] would have been meaningless. Accordingly, no material issue of fact is presented with respect to this contention.

### 5. *The Earnings of Armour.*

Plaintiff alleges that the proxy statement was false and misleading in stating that there would be "some" decline in Armour earnings for the first half of 1965 rather than a substantial decrease in such earnings (Complt. ¶ 34(e)). The proxy statement contained the following:

"The six-month earnings period closed on May 1, 1965, and earnings therefor are not available at this time. It does appear, however, that there will be some decline in earnings for the first half of 1965 from the corresponding period of 1964." Proxy Statement, p. 6.

It does not appear that plaintiff is contesting the availability of the data on May 5, 1965, the only point in issue here being the sufficiency of the pessimistic position being taken in the proxy statement. Plaintiff contends that the reference to "some" decline connoted a decline of an insignficant nature and that the decline was anything but insignificant. On May 21, 1965, the defendant Perry A. White wrote to the BLH shareholders enclosing a letter from the defendant Prince of May 19, 1965, which set forth the Armour earnings for the first half of 1965.[33] Plaintiff claims that this letter was received after a majority of shareholders had cast proxies in favor of the proposed merger.[34]

■ With respect to plaintiff's contentions regarding the sufficiency of the statement of Armour earnings, two material fact questions emerge: (a) the sufficiency of the description in the proxy statement of the decline in Armour earnings, and (b) the sufficiency of the May 21, 1965 letter. See Willoughby v.

---

32. See text accompanying notes 16–17.

33. See note 11 and Exhibit B. The Prince letter to the Armour shareholders stated in pertinent part:

Armour and Company earnings for the twenty-six weeks ended May 1, 1965 are estimated to be * * * equal to $1.35 per share. In the corresponding period of a year ago, the earnings were * * * $1.66 per share. The earnings decline of 14% is principally attributable to the drastic rise in hog prices * * *.

34. Plaintiff contends that at the time the May 21, 1965 letter was received by the shareholders, more than a majority of the BLH shareholders had voted in favor of

the merger so that this letter was merely "too little and too late." As authority for this, he points to the statement of Arthur Dean, Esq., at the Philadelphia injunction hearing wherein it was stated that "as of this morning some 60 per cent of the Baldwin vote was in, and about 57¼ was favorable and almost 3 per cent was in the negative." Evans v. Armour & Co., TR at 340, June 3, 1965. The statement cannot stand for the proposition that a majority had voted in favor of the proposal by May 25, 1965 (the approximate date that it would appear the letter was received), but would show only that a majority had voted in favor one week thereafter.

Port, 182 F.Supp. 496, 499 (S.D.N.Y.), modified on other grounds, 277 F.2d 149 (2d Cir. 1960) (per curiam). Accordingly, these are issues to be decided at a trial and summary judgment cannot be ordered with respect to this allegation.

### 6. The "Adverse Interests" of the Defendant Elmendorf.

■ Plaintiff claims that the proxy statement fails to reveal that the defendant Elmendorf was a limited partner of and consultant to Wertheim and a director of Packers, a corporation in which Armour had a substantial stock interest (Complt. ¶ 34(f)). At page 36 of the proxy statement, Armour's interest in Packers is set forth. Armour owned 757,594 shares of capital stock which was voted by an independent trustee. It is clear from the nature of the relationship that Armour had no control over Packers. On May 26, 1965, a letter was sent to BLH shareholders advising them of Elmendorf's interest in Wertheim and Packers. The material set forth therein is not disputed. The letter states that

> Mr. Elmendorf is also a limited partner of Wertheim & Co. Mr. Elmendorf receives a fixed return of $5,000 per year on his investment in Wertheim & Co. but does not share in the profits or losses of such firm. He therefore has no interest in any profits of Wertheim & Co. arising from the fee of $120,000 to be paid by Armour upon consummation of the merger or in any other amounts paid by Armour or BLH to Wertheim & Co. * * *

Plaintiff contends that this letter, like the May 21st letter, was "too little and too late." However, since the facts of the above letter do not appear to be disputed, the omission from the proxy statement of Elmendorf's interest in Wertheim and Packers cannot be deemed material. Evans v. Armour & Co., supra, 241 F.2d at 709. Although plaintiff correctly argues that the findings of fact made in the Evans action must be limited to findings made on a motion for a preliminary injunction which necessarily put a plaintiff to a stiffer burden of proof, Kauder

v. United Board & Carton Corp., 199 F. Supp. 420, 423 (S.D.N.Y.1961); Shvetz v. Industrial Rayon Corp., 212 F.Supp. 308, 309 (S.D.N.Y.1960); Dunn v. Decca Records, Inc., supra, 120 F.Supp. at 3, nevertheless the conclusion reached by Chief Judge Clary with respect to the Elmendorf interests based on exactly the same facts herein is most persuasive. Accordingly, based on the papers submitted to me, I find that no material issue of fact is presented on this point and this allegation of plaintiff's will be deleted from the case.

### 7. The Information Regarding the Institution of the Evans Action.

■ It is further alleged by plaintiff that defendants failed to amend the proxy statement to disclose that a derivative and representative action had been commenced on behalf of BLH and its shareholders by the defendant Evans which action was a valuable asset of BLH and which would be appropriated by the defendant Armour without payment to BLH and its shareholders (Complt. ¶ 34 (g)).

Defendants argue that the Evans action was commenced on May 13, 1965, eight days after the proxy statement was mailed, that a special meeting of the board of directors was held on May 19, 1965 wherein Evans was allowed to attend and present his objections to the proposed merger, that the board reaffirmed and ratified their previous action in approving the merger, and that promptly thereafter on May 21, 1965, notice of the board's action and of the commencement of the Evans action was mailed to shareholders. Plaintiff claims that the May 21st letter failed to state that the Evans action was derivative so that the shareholders were not made aware that the action was an asset of BLH.

The letter states the following:

> On May 13, 1965, T. M. Evans brought suit in the United States District Court for the Eastern District of Pennsylvania against the Company, the individual directors of the Com-

any and Armour and Company seeking to enjoin the Special Meeting of Shareholders to be held June 10, 1965 and asking that the Joint Plan and Agreement of Merger be terminated and for damages. Mr. Evans * * * alleges that he is the beneficial owner of more than 100,000 shares of Common Stock of Baldwin-Lima-Hamilton Corporation.

Defendants argue that the letter speaks for itself.[35] While plaintiff does not contend that the letter was untimely, plaintiff's argument that it does not reveal the nature of the *Evans* action presents an additional issue of fact to be determined by the trier of the fact issues. The only portions of the letter that can be interpreted to mean that the action is derivative are that BLH was named as a defendant and that Evans was a shareholder. But it is clear that such factors may be as consistent with an individual action or a spurious class action. Accordingly, defendants' contention that no material issue of fact is presented is without merit. Additionally, it should be determined at a trial whether the omission, if such is found, was material in influencing the shareholders' vote in favor of the merger.

### 8. The Misrepresentations of the White "Cover" Letter Mailed with the Proxy Statement.

■ Plaintiff's final allegation with respect to the proxy material is that a letter annexed to the proxy statement from the defendant Perry A. White to the BLH shareholders was false and misleading in characterizing the Armour record over the past five to six years as impressive since the Armour earnings experienced a 14 per cent decline for the six-month period ending May 1, 1965 (which decline plaintiff claims is "substantial") and because of the highly cyclical nature

of the Armour business (Complt. ¶ 34 (h)).

It is not disputed that the Armour earnings for the period ending May 1, 1965 were not available at the time of the mailing. See Evans v. Armour & Co., supra, 241 F.Supp. at 710. Plaintiff contends that the letter denigrated BLH's business while lauding Armour's business which, according to plaintiff, was equally cyclical. Defendants argue that even assuming a misrepresentation, the shareholders were directed to the proxy statement with the admonition that they read it carefully.

Regardless of the warning to read the proxy statement, I am of the opinion that this would not cure any defect in the letter. Shareholders naturally would read the cover letter first to determine what they were being asked to examine, and the impression of Armour's glowing business record which might conceivably be created by the White letter might well overshadow any statement to the contrary in the proxy statement. It is my opinion that a material question of fact has been presented with respect to this allegation.

### Plaintiff's Rule 10b–5 Claim.

■ Since a cause of action has been stated under § 14(a) and Rule 14a–9, no discussion is necessary herein with respect to the directors of BLH, Armour, Wertheim, and Goldman, Sachs since all such defendants allegedly either solicited proxies or permitted the use of their names to solicit proxies within the meaning of § 14(a).[36] A preliminary observation which may be made is that it is unclear whether an alleged misrepresentation in or an omission from a proxy statement may be sufficient grounds to make out a claim under § 10(b) or Rule 10b–5. In Barnett v. Anaconda Co., 238 F.Supp. 766 (S.D.N.Y.1965), Judge Bryan stated that since § 14(a) specifically deals with deceptive proxy ma-

---

**35.** The text of this letter is set forth in full in Exhibit B to this opinion. See text accompanying note 11, supra.

**36.** Of course, a question of fact is presented as to whether the defendants Wertheim and Goldman, Sachs "permitted" their names to be used in an allegedly fraudulent proxy statement.

terial, § 10(b) and Rule 10b–5 should not provide different remedies for actions which in reality should be brought under § 14(a). Id. at 776. However, as pointed out therein, "it is still an open question whether fraud in a proxy statement can constitute a violation of § 10 (b)." Ibid. However, in Simon v. New Haven Board & Carton Co., 250 F.Supp. 297 (D.Conn.1966), Judge Zampano, without directly discussing the issue found that the complaint, in characterizing the proxy statement as "the painting of an overly pessimistic picture" of the company's future, sufficiently alleged fraud to constitute a Rule 10b–5 claim. Id. at 299. Finally, the Court of Appeals in *Borak,* supra, left the issue open, expressly stating that no opinion would be given as to whether misleading proxy material may constitute manipulative or deceptive devices within § 10(b). 317 F.2d 838, 847. No decision need be reached herein on this issue either.

 The only issue to be decided with respect to the § 10(b) violation concerns the defendant Evans. It is alleged that Evans entered the so-called conspiracy some time prior to September 30, 1965 (Complt. ¶ 43) when Evans sold his shares to Armour. Since it is clear from the affidavits that Evans participated in no act prior to the allegedly fraudulent merger which might have induced any "sale" to Armour by plaintiff, other shareholders, or by BLH itself, it is not clear how a cause of action can be stated against him under § 10(b), Rule 10b–5 or § 17 of the Securities Act of 1933. In other words, there can be no causal connection between the exchange of Armour shares for BLH and the alleged "sell-out" of the Evans shares. List v. Fashion Park, Inc., 340 F.2d 457, 463 (2d Cir.), cert. denied, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965); Barnett v. Anaconda Co., supra, 238 F.Supp. at 775; cf. Securities & Exch. Comm'n v. Texas Gulf Sulphur Co., 258 F.Supp. 262, 277 (S.D.N.Y.1966). In fact, plaintiff al-

leges nothing more than that this was the final step in the scheme to defraud. But, if the purchase or sale has already taken place, it is submitted that any act thereafter cannot possibly have caused the within purchase or sale.

 Plaintiff cites Stockwell v. Reynolds & Co., 252 F.Supp. 215 (S.D. N.Y.1965) for the proposition that Rule 10b–5 is applicable to fraud occurring subsequent to the purchase or sale when employed in connection with that purchase or sale. But the *Stockwell* case holds nothing of the kind, standing only for the proposition that where a shareholder is induced by a defendant's fraudulent acts to retain his shares which he subsequently sells to his detriment, a claim is stated under Rule 10b–5. But a necessary corollary to this proposition is that the fraudulent representation in some manner induced the shareholder's act or failure to follow his intended course. Although plaintiff need not prove common law fraud to prevail in a 10b–5 action, Stevens v. Vowell, 343 F. 2d 374, 379 (10th Cir. 1965); Royal Air Properties, Inc. v. Smith, 312 F.2d 210, 212 (9th Cir. 1962); Ellis v. Carter, 291 F.2d 270, 274 (9th Cir. 1961); Securities & Exch. Comm'n v. Texas Gulf Sulphur Co., supra, 258 F.Supp. at 277, he must at least allege that the purchase or sale and the fraud complained of had some interrelationship. See Royal Air Properties, Inc. v. Smith, supra, 312 F. 2d at 212; cf. Barnett v. Anaconda Co., supra. This the plaintiff has not done with respect to the defendant Evans.

Accordingly, the first cause of action of the complaint insofar as it attempts to state a claim against the defendant Evans will be dismissed.

*Plaintiff's Rule 10b–6 Claim.*

Although not essential to a determination herein, I have previously indicated that it was my opinion that a 10b–6 claim has been stated. The facts concerning the Armour rights offering have been set forth, supra.[37]

---

**37.** See note 28, supra. It is clear that no claim can be stated against the defendant Evans with respect to the rights offering.

Rule 10b–6 provides in pertinent part that

"(a) It shall constitute a 'manipulative or deceptive device or contrivance' as used in section 10(b) of the act for any person,

(1) Who is an underwriter * * in a *particular distribution of securities,* or

(2) Who is the issuer * * *

(3) * * *

* * * to bid for or purchase * * any security which is the subject of such distribution, *or any security of the same class and series,* or any right to purchase any such security, *or to attempt to induce any person to purchase any such security or right,* until after he has completed his participation in such distribution * * *." (Emphasis added.)

■■ The purpose of Rule 10b–6 is to prohibit trading activity which might affect the price of the securities being offered and thus create unnatural market levels. See 3 Loss, Securities Regulation 1596 (2d ed. 1961). I have previously determined that there is a question of fact as to whether the "discussions" could properly be considered "negotiations" at the time of the rights offering. Plaintiff may properly be considered a purchaser of Armour securities. Hooper v. Mountain States Sec. Corp., 282 F.2d 195 (5th Cir. 1960), cert. denied, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961); see H. L. Green Co. v. Childree, 185 F.Supp. 95 (S.D.N.Y. 1960); cf. Ruckle v. Roto Am. Corp., 339 F.2d 24, 27 (2d Cir. 1964). And as such, the trier of fact could conclude that Armour's activity was an "attempt to induce * * * [plaintiff and other BLH shareholders] to purchase any such security" or a "security of the same class and series," and thus find a violation of Rule 10b–6(a) (2). The fact that the mere mechanics of the merger may not have been consummated until July does not remove the transaction from the operation of the Rule, since the prohibited act, namely, the alleged attempts to induce the purchase of the Armour securities, purportedly occurred in February. Whether these discussions had the effect of artificially maintaining the price of Armour is also an issue of fact.

Accordingly, material issues of fact are presented with respect to plaintiff's 10b–6 claim and summary judgment must be denied on the first cause of action.

### The Second Cause of Action of the Complaint.

The claims of plaintiff in the second count of his complaint are alleged only against Armour and Evans. They are alleged solely in a derivative capacity on behalf of BLH and jurisdiction is based upon diversity of citizenship (Complt. ¶¶ 57, 58). There is no identification of specific state law or of the legal theory upon which plaintiff purports to rely in asserting this claim.

The allegations in the second count are quite confused and no explanation thereof to dispel this confusion was offered until plaintiff's rejoinder memorandum was filed in court at the time of oral argument. Construing the pleadings so as to do substantial justice in accordance with Rule 8(f) of the Federal Rules of Civil Procedure, I find that two theories of liability are alleged in this count.

The first is that Armour agreed to purchase BLH's net assets for $87,036,-000 or $20.90 for each outstanding share of BLH common stock. Plaintiff alleges that the agreed form of payment for BLH's assets was to be the exchange of a package of Armour securities having a value of $20.90 for each share of BLH, but that the package of Armour securities issued actually had a value of only $18.11 for each share of BLH so that Armour purchased BLH's net assets for only $75,432,688.

■ I find this theory to be tenuous at best. The Joint Plan and Agreement of Merger provided only for an exchange of Armour common and preferred stock for the shares of BLH. There

was no reference in the agreement to the payment of any dollar amount nor any representation as to the value either of the Armour common stock or of the yet-to-be-issued preferred stock. There was no undertaking of any kind to pay net asset value.

The absurdity of plaintiff's contention is highlighted by considering what would have happened if the Armour stock at the time of the merger had had a market value of more than the $20.90 figure claimed by plaintiff to be the agreed and "fair" price. Under plaintiff's argument, the BLH shareholders would have been required to pay back the excess value—a result which is obviously absurd and to which plaintiff would never have agreed.

Accordingly, since the merger agreement conclusively demonstrates the lack of merit in this position, any allegation of insufficiency of consideration is deemed stricken from the second count.

Plaintiff's second theory presents more difficult problems. Plaintiff contends that Evans was a fiduciary and was "bought-off" and therefore his wrongful gains are to be disgorged. It is claimed that Armour, in "buying-off" Evans, is equally liable for the alleged breach of trust.

In Young v. Higbee Co., 324 U.S. 204, 65 S.Ct. 594, 89 L.Ed. 890 (1945), it was held that parties "cannot avail themselves of the statutory privilege of litigating for the interest of a class and then shake off their self-assumed responsibilities to others by a simple announcement that henceforth they will trade in the rights of others for their own aggrandizement." Id. at 213, 65 S.Ct. at 599; see 13 Fletcher, op. cit. supra § 6020, at 623 n. 14. This is especially true since the stockholder suing for the benefit of the corporation, while technically not a trustee, is a fiduciary. Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 549, 69 S.Ct. 1221, 1227, 93 L. Ed. 1528 (1949).

"He sues, not for himself alone, but as representative of a class comprising all who are similarly situated. The interests of all in the redress of the wrongs are taken into his hands, dependent upon his diligence, wisdom and integrity. And while the stockholders have chosen the corporate director or manager, they have no such election as to a plaintiff who steps forward to represent them. He is a self-chosen representative and a volunteer champion." Ibid.

This self-assumed obligation of corporate champion cannot be shed at will as in a case where only individual interests are involved. Mashek v. Silberstein, 20 F.R.D. 421, 422 (S.D.N.Y. 1957); cf. Young v. Higbee Co., supra, 324 U.S. at 213, 65 S.Ct. 594. If what has been alleged is true and Evans has preferred himself over the other BLH shareholders, said defendant has committed a breach of trust for which he would have to account. At least a question of fact is presented as to Evans' purported preference. And, if it be found that Armour knowingly participated in Evans' alleged acts, it will be equally liable, for those "who knowingly join a fiduciary in such an enterprise likewise become jointly and severally liable with him for such profits." Jackson v. Smith, 254 U.S. 586, 589, 41 S.Ct. 200, 201, 65 L.Ed. 418 (1921); see Bankers Life and Cas. Co. v. Kirtley, 338 F.2d 1006, 1013 (8th Cir. 1964); Sexton v. Sword S. S. Line, Inc., 118 F.2d 708, 711 (2d Cir. 1941); Irving Trust Co. v. Deutsch, 73 F.2d 121, 125 (2d Cir. 1934), cert. denied 294 U.S. 708, 55 S.Ct. 405, 79 L.Ed. 1243 (1935); Oil & Gas Ventures—First 1958 Fund, Ltd. v. Kung, 250 F.Supp. 744, 749 (S.D.N.Y. 1966); Industrial Waxes, Inc. v. International Ry. of Central America, 193 F. Supp. 783, 786 (S.D.N.Y.1961).

Defendant Evans presents a three-pronged argument which can be summarized as follows:

(1) Having dissented, he had no choice but to discontinue his derivative action;

(2) The dismissal of the action in Sonnenschein v. Evans, supra, is res

judicata of the issues presented herein; and

(3) Plaintiff, by instituting this action, seeks to deny full faith and credit to the determination of Chief Judge Clary that the Evans settlement was reasonable.

■ Evans' first argument that he had no choice but to discontinue his derivative action is without merit. He cites no decision of a Pennsylvania court that has so held nor could he do so. In Ramsburg v. American Inv. Co., 231 F.2d 333 (7th Cir. 1956), plaintiffs, shareholders, of a Delaware Corporation, submitted written requests for appraisal to their merged corporation. Defendants argued that said plaintiffs thereby forfeited their status as shareholders. The Delaware Code of 1953 provided in Section 262 of Title 8 that a dissenting stockholder may, "within 20 days after the date of mailing of the notice" of merger demand payment for his stock. The Delaware Courts have determined that failure to seek appraisal constitutes consent to the merger. Porges v. Vadsco Sales Corp., 27 Del.Ch. 127, 32 A.2d 148 (1943); Federal United Corp. v. Havender, 24 Del.Ch. 318, 11 A.2d 331 (1940); Cole v. National Cash Credit Ass'n, 18 Del.Ch. 47, 156 A. 183 (1931). But cf. Voege v. American Sumatra Tobacco Corp., supra, 241 F.Supp. at 375. The Ramsburg Court found that in spite of the Delaware statute, plaintiffs, by dissenting pursuant to the statute, did not elect their remedy since by going ahead with the merger, defendants forced them to seek appraisal or remain silent in which case they would be deemed to have consented to the merger. 231 F.2d at 340. The reasoning of the 7th Circuit is sound and, accordingly, I find that Evans would not have been barred from continuing his suit since the Pennsylvania statute is, for all intents and purposes, the same as the law of Delaware with respect to dissenters and the Pennsylvania courts would most likely reach the same result as reached in Ramsburg.

Defendant Evans' second contention is similarily without merit. In Sonnenschein v. Evans, supra, a former BLH shareholder commenced an action against defendant Evans in the New York Supreme Court. Plaintiff in the Sonnenschein action commenced suit to compel Evans to account to her and all former shareholders of BLH whose shares were exchanged for Armour securities. No representation was made that the action was brought derivatively on behalf of BLH (Complt. Sonnenschein v. Evans, ¶ 1(b) ). Evans alleges herein that since the Sonnenschein action was dismissed because plaintiff lacked capacity to sue, that decision is res judicata of the issues herein.[38]

■ The representative action in Sonnenschein was a so-called "spurious class action", Zahn v. Transamerica Corp., 162 F.2d 36, 49, 172 A.L.R. 495 (3d Cir. 1947), and as such did not adjudicate the rights or liabilities of any person not a party thereto. Lipsett v. United States, 359 F.2d 956, 959 (2d Cir. 1966); All American Airways v. Elderd, 209 F.2d 247, 249 (2d Cir. 1954); California Apparel Creators v. Wieder of California, Inc., 162 F.2d 893, 895, 174 A.L.R. 481 (2d Cir.), cert. denied 332 U.S. 816, 68 S.Ct. 156, 92 L.Ed. 393 (1947); Oppenheimer v. F. J. Young & Co., 144 F.2d 387, 390 (2d Cir. 1944). In the instant case, plaintiff was not an original party to the Sonnenschein suit and did not intervene therein so he cannot be bound thereby. Additionally, BLH, on whose behalf this count was brought, was not a party nor did the Sonnenschein decision state that a suit could not be brought derivatively on behalf of that corporation. Accordingly, it is concluded that this contention of defendant Evans must be disregarded.

Evans finally alleges that by instituting this action, plaintiff seeks to deny

---

38. If anything, Evans' defense is properly collateral estoppel rather than res judicata since the Sonnenschein action was not a judgment on the merits. Kane v. Central Am. Mining & Oil, Inc., 235 F. Supp. 559, 568 (S.D.N.Y.1964).

full faith and credit to the determination of Chief Judge Clary that the Evans settlement was reasonable. Whether the effect to be given the Pennsylvania District Court dismissal is based upon the full faith and credit clause (U.S.Const. Art. IV, § 1) or upon the doctrine that "all federal courts are components of a single judicial system," Sherman v. Jacobson, 247 F.Supp. 261, 266 n. 21 (S.D. N.Y.1965), the decision of Chief Judge Clary must be recognized if valid. See Caterpillar Tractor Co. v. International Harvester Co., 120 F.2d 82, 85, 139 A.L. R. 1 (3d Cir. 1941). Compare Baldwin v. Iowa State Traveling Men's Ass'n, 283 U.S. 522, 524, 51 S.Ct. 517, 75 L.Ed. 1244 (1931) with Durfee v. Duke, 375 U.S. 106, 107 n. 2, 84 S.Ct. 242, 11 L.Ed. 2d 186 (1963).

 In a true class action, notice to shareholders of a proposed voluntary dismissal is mandatory, Pittston Co. v. Reeves, 263 F.2d 328, 329 (7th Cir. 1959); Cross v. Oneida Paper Prods. Co., 117 F.Supp. 919, 921 (D.N.J.1954); see Brendle v. Smith, 7 F.R.D. 119 (S.D. N.Y.1946), and a shareholders' derivative action is a true class action, Certain-Teed Prods. Corp. v. Topping, 171 F.2d 241, 243 (2d Cir. 1948); Brendle v. Smith, supra. Chief Judge Clary gave no reason for dispensing with the notice requirement of old Rule 23 of the Federal Rules of Civil Procedure. This Court need not speculate as to Chief Judge Clary's reason for dismissing the *Evans* action without notice to shareholders. Even while recognizing the validity of the dismissal, this Court can have the defendant Evans account to the shareholders of BLH for any excess he was paid in agreeing to the dismissal of his action. Although under this theory the liability of Armour would appear questionable, a question of fact is still raised as to whether Armour induced Evans' alleged acts.

Accordingly, I conclude that plaintiff's second cause of action is valid and defendants' motion to dismiss said cause of action is in all respects denied.

## Change of Venue.

Defendants (except for defendant Evans) move pursuant to 28 U.S.C. § 1404(a) (1964) for transfer of any matters remaining for determination to the Eastern District of Pennsylvania. Giving the factor of plaintiff's New York residence the minimum weight it deserves in a derivative action, Koster v. (American) Lumbermens Mut. Cas. Co., 330 U.S. 518, 524–525, 67 S.Ct. 828, 91 L.Ed. 1067 (1947), I nevertheless find that at best defendants have merely shown that venue is equally proper in Pennsylvania. While defendants argue that the basis of plaintiff's attack is the failure of Chief Judge Clary to provide for notice, this provides only a very small aspect of plaintiff's case. In addition, Rule 60(b) of the Federal Rules of Civil Procedure allows a plaintiff to commence an independent action to attack what he considers to be an invalid judgment.

Defendants have shown that six of the defendants are Philadelphia residents whereas four defendant directors are New York residents, including two of the three interlocking directors of BLH and Armour. The defendants Goldman, Sachs and Wertheim are New York residents while the defendant Evans, a Connecticut domiciliary, maintains a residence in the Southern District of New York. Additionally, the defendant Armour transacts business and maintains executive offices in this district.

As is apparent from the previous determination made by this Court, the testimony of the defendants Armour, Evans, Wertheim, Goldman, Sachs, Steinbach, Rentschler, and Prince will be essential to the proof of plaintiff's case and all of these prospective witnesses, with the exception of Prince, either reside in New York, maintain offices or transact business here. The defendant Prince is an Illinois resident so that as to him there is no difference whether venue is laid in this district or in Pennsylvania. Also, many of the transactions complained of occurred in New York.

The familiarity of the Pennsylvania District Court with the transactions com-

plained of is irrelevant since, in deciding these motions, this Court, of necessity, was required to completely familiarize itself with the prior litigation and to thoroughly examine the papers submitted therein. In addition, since it is doubtful that Pennsylvania law is applicable to the first cause of action, defendants' reliance on Van Dusen v. Barrack, 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed. 2d 945 (1964) is inapposite.

Defendants' argument that the documentary evidence is in Pennsylvania is without merit since most of these documents appear to have either been submitted to Chief Judge Clary (and are presently before me) or are in the possession of Armour's New York counsel. Any other documents in the possession of Armour or Evans can as readily be produced in New York as in Pennsylvania.

■ Finally, plaintiff's second cause of action is based upon diversity of citizenship. Venue is only initially proper in the district where all plaintiffs or all defendants reside under 28 U.S.C. § 1391(a) (1964). In the case at bar, plaintiff is a New York resident and neither defendant resides in the same district so that venue for this cause of action was only proper in this district. In order to transfer an action, such transfer would only have been proper to a district where the action might properly have been brought originally. 28 U.S.C. § 1404(a) (1964); Hoffman v. Blaski, 363 U.S. 335, 80 S.Ct. 1084, 4 L.Ed.2d 1254 (1960); Glicken v. Bradford, 204 F.Supp. 300, 302–303 (S.D.N.Y.1962).

■ Accordingly, for all of the foregoing reasons, defendants' motion for a change of venue is denied.

### Plaintiff's Failure to Join An Indispensable Party.

■ Defendants contend that plaintiff, before proceeding further herein, must join as an indispensable party one Nathan Saks with whom plaintiff jointly owned the BLH shares.

In Vann v. Industrial Processes Co., 247 F.Supp. 14 (D.D.C.1965), Judge Holtzoff in considering the identical problem stated,

> "plaintiff's shares * * * are owned by Mary B. Vann and her sister, Ann B. Lackman. Some question has been raised as to whether Mary B. Vann is qualified to bring a stockholder's action without joining her co-owner. The Court is of the opinion that she is qualified. She is either a tenant in common or a joint tenant of the stock. If she is a tenant in common, she has a one-half interest in the stock. If there is a joint tenancy, then each owns the whole, subject to the right of survivorship. In either event, the Court is of the opinion that Mary B. Vann is qualified to bring this suit." Id. at 17.

The case is dispositive of the issue herein. Accordingly, the motion is denied.

### Conclusions.

Rule 12(b) of the Federal Rules of Civil Procedure provides that where a motion is made to dismiss for failure to state a claim upon which relief can be granted, and matters outside the pleadings have been presented to and have not been excluded by the Court, the motion shall be treated as provided in Rule 56 (Summary judgment) with all parties being given the reasonable opportunity to submit all material pertinent to a Rule 56 motion. Extensive affidavits have been submitted herein and thoroughly examined by the Court.

Pursuant to Rule 56(d), I have determined that there are certain uncontroverted facts and these shall be deemed established on a trial of this action. The following are the facts which are uncontroverted:

(1) There was no material omission from the BLH proxy statement regarding the amount to be paid dissenters.

(2) There was no material omission from the BLH proxy statement with respect to the interests of the defendant Elmendorf.

(3) There was no material misrepresentation in the BLH proxy statement concerning the value of the Armour package.

(4) There was no failure of consideration passing from Armour to BLH.

Plaintiff's remaining allegations all present questions of fact.

In conclusion, I have determined that defendants' motions pursuant to Rules 9(a) and 12(b) of the Federal Rules of Civil Procedure to strike all matter from the complaint purporting to state a claim derivatively on behalf of BLH are to be denied. Defendant Evans' motion to dismiss for failure to state a claim on which relief can be granted is granted as to the first count, denied as to the second. The remaining defendants' motions to dismiss are in all respects denied. Defendants' motion to transfer this action pursuant to 28 U.S.C. § 1404(a) is denied. Defendants' motion to compel plaintiff to join the co-owner of his shares as a party plaintiff is denied.

It is so ordered.

## EXHIBIT A

### EXECUTIVE OFFICES

## BALDWIN-LIMA-HAMILTON CORPORATION

### PHILADELPHIA NATIONAL BANK BUILDING

### PHILADELPHIA 7, PENNSYLVANIA

**PERRY A. WHITE**
PRESIDENT

May 5, 1965

*To the Shareholders of Baldwin-Lima-Hamilton Corporation:*

There is enclosed herewith a Notice of Special Meeting of the Shareholders of Baldwin-Lima-Hamilton Corporation together with a Proxy Statement and Form of Proxy for use at said meeting. The purpose of the Special Meeting of Shareholders is to consider and act upon a proposal to adopt a Joint Plan and Agreement of Merger providing for the merger of BLH into Armour and Company.

The Joint Plan and Agreement of Merger provides that each share of Common Stock of BLH would receive 13/100ths of a share of new $4.75 Preferred Stock of the par value of $100 per share and 1/8th of a share of Common Stock of Armour. Complete details concerning the exchange are covered in the enclosed Proxy Statement.

The proposed merger of BLH into Armour has been given careful consideration by the Boards of Directors of both companies. You who have been shareholders of BLH for some years are aware of its ever changing fortunes. Most of the products of BLH are capital account items, and many are tailor-made, involving many years of engineering and large tooling costs—oftentimes the orders are not repetitive and the engineering and tooling can only be used as a base for future modifications.

The Armour record over the last five to six years has been impressive. Armour has diversified its business, which is essentially making and distributing consumer products. In addition to meat and grocery products, Armour is engaged in making chemicals and pharmaceuticals. Undoubtedly, Armour is attracted to BLH be-

cause of its financial strength, its engineering skills and its current record of considerably improved profit.

You are urged to read the Proxy Statement carefully. In it you will note on page 3 a table showing comparative data with respect to market prices, earnings, dividends and book values of the Common Stocks of BLH and Armour. The table indicates that on the basis of 1964 dividends BLH shareholders would have received from Armour more than double the dividends paid on BLH shares during such year.

The Board of Directors of Baldwin-Lima-Hamilton Corporation strongly urges its shareholders to vote in favor of the Joint Plan and Agreement of Merger. A majority vote of the outstanding shares is required for its approval by BLH shareholders.

Respectfully submitted,

PERRY A. WHITE
*President*

EXHIBIT B

**EXECUTIVE OFFICES**

## BALDWIN-LIMA-HAMILTON CORPORATION

**PHILADELPHIA NATIONAL BANK BUILDING**

**PHILADELPHIA 7, PENNSYLVANIA**

**PERRY A. WHITE**
PRESIDENT

May 21, 1965

TO THE SHAREHOLDERS OF BALDWIN-LIMA-HAMILTON CORPORATION:

At the time the Proxy Statement dated May 5, 1965 was mailed to the shareholders of Baldwin-Lima-Hamilton Corporation, the Armour and Company earnings for the six-month period closed on May 1, 1965 were not available. Estimated earnings for this period have now become available and we enclose for your information a copy of a letter dated May 19, 1965 to the Armour and Company stockholders setting forth these figures as well as the amount of the non-operating loss of $4,250,000, which will be a special charge after determination of net income for 1965, in connection with the closing of Armour's Kansas City plant referred to in the Proxy Statement on pages 12 and 42.

On May 13, 1965, T. M. Evans brought suit in the United States District Court for the Eastern District of Pennsylvania against the Company, the individual directors of the Company and Armour and Company seeking to enjoin the Special Meeting of Shareholders to be held June 10, 1965 and asking that the Joint Plan and Agreement of Merger be terminated and for damages. Mr. Evans is the Chairman of the Board of H. K. Porter Company and Crane Company and alleges that he is the beneficial owner of more than 100,000 shares of Common Stock of Baldwin-Lima-Hamilton Corporation. The Board of Directors of the Company, at a

Special Meeting held on Wednesday, May 19, 1965, after full consideration of all relevant factors, adopted the following resolution:

"RESOLVED, that the Board of Directors of Baldwin-Lima-Hamilton Corporation, having considered the complaint filed on May 13, 1965 with the United States District Court for the Eastern District of Pennsylvania on behalf of T. M. Evans against Armour and Company, each of the Directors of Baldwin-Lima-Hamilton Corporation and such corporation itself, having considered in detail each and every allegation contained in such complaint, having considered the presentation made today by T. M. Evans and his counsel, Messrs. Kohn and Lockhart, to this Board of Directors, including the possibility of a treble damage action against General Motors Corporation in the event that the United States Government should succeed in its pending anti-trust action with respect to restraint of trade in diesel locomotives, having reviewed the proxy material sent to the shareholders, having considered the respective market prices of the stock of Baldwin-Lima-Hamilton Corporation and of Armour and Company to the present time, and the earnings of Armour and Company for the six months period ending May 1, 1965, a copy of which is filed with these minutes, and having discussed all of the foregoing matters at length among themselves and with the aid of counsel, it continues to be the judgment of the Board of Directors that the Joint Plan and Agreement of Merger between Baldwin-Lima-Hamilton Corporation and Armour and Company is in the best interests of the shareholders of the Corporation and hereby reaffirms and ratifies its approval by resolution at the meeting of such Board of Directors on April 20, 1965 of the Joint Plan and Agreement of Merger between Baldwin-Lima-Hamilton Corporation and Armour and Company executed on such date and hereby reaffirms and ratifies all action taken at such meeting in connection with such Joint Plan and Agreement of Merger and that the management be authorized to take any and all action as may be necessary to carry the Joint Plan and Agreement into force and effect."

The pending anti-trust action by the United States Government against General Motors Corporation, referred to in the above resolution, is a civil action filed January 14, 1963 in the Northern District of Illinois under Section 2 of the Sherman Act and Section 7 of the Clayton Act. The Complaint alleges monopolization by General Motors Corporation of the railroad locomotive business, a business in which Baldwin-Lima-Hamilton Corporation was engaged until 1956, when its diesel locomotive product line was discontinued. A companion criminal action has been discontinued by the Government for insufficient evidence. Pending the outcome of the civil case and study of the evidence produced, no realistic appraisal of a possible claim by Baldwin-Lima-Hamilton Corporation against General Motors Corporation can be made, and therefore no value has been assigned to it. Moreover, it is impossible to predict when this necessary information will become available since not even a trial date has yet been fixed for the Government case.

Copies of the complaint filed by Mr. Evans are available for examination by any shareholder at the office of the Company, 2232 Philadelphia National Bank Building, Philadelphia, Pennsylvania 19107.

Sincerely yours,

PERRY A. WHITE
*President*

## EXHIBIT C

### COMPARATIVE DATA

There is set forth below on pages 4 to 8 data relating to the respective market prices, earnings, dividends and book values of the Common Stock of Armour and BLH, as well as pro forma earnings and financial condition of the surviving corporation. The following table, containing the indicated comparisons, is based upon such data, which should be read in connection herewith.

| Security(a) | Market Price 3/31/65 | 1964 Earnings Attributable | 1964 Dividends | Book Value(b) |
|---|---|---|---|---|
| **ARMOUR STOCKHOLDER** | | | | |
| Before merger ....... 1 share of Common Stock ($5 par value) | $47.38 | $3.74(c) | $1.27(d) | $38.15 |
| After merger ........ 1 share of Common Stock ($5 par value) *pro forma* | $47.38 | $3.85(c)(e) | $1.27(d) | $39.10 |
| **BLH STOCKHOLDER** | | | | |
| Before merger ....... 1 share of Common Stock ($13 par value) | $17.50 | $0.76 | $0.40 | $25.89 |
| After merger ...... ⅙th share Common Stock ($5 par value) *pro forma* | $ 7.90 | $0.64(c)(e) | $0.21(d) | $ 6.52 |
| 13/100ths share $4.75 Preferred Stock ($100 par value) *pro forma* | Par Value(f) $13.00 | $0.62(g) | $0.62 | $13.00(h) |
| Total | | $1.26(e) | $0.83(d) | $19.52 |

(a) Fractional shares will not be issued. See "Capitalization and Changes in Stock upon the Merger—Fractional Share Interests" at page 10.

(b) As of October 31, 1964, in the case of Armour, adjusted to give effect to 10% stock dividend paid February 1, 1965. As of December 31, 1964, in the case of BLH.

(c) Net income per share of Armour Common Stock has been computed on the basis of the number of shares issued at the end of the fiscal year 1964, adjusted to give effect to the 10% stock dividend paid February 1, 1965.

(d) Adjusted to give effect to the 10% stock dividend paid by Armour on February 1, 1965. In the first quarter of its

current fiscal year, Armour increased its dividend to 40¢ from 35¢ per share and in the second quarter of such year continued the 40¢ dividend on the increased number of shares resulting from the 10% stock dividend.

(e) Includes the earnings adjustments referred to below and on page 8.

(f) Inasmuch as none of the $4.75 Preferred Stock was outstanding on March 31, 1965, there was no market price for such stock on that date. For purposes of this comparison, the $4.75 Preferred Stock is included on the basis of its par value.

(g) Represents the pro forma dividend on 1⅗₀₀ths share of $4.75 Preferred Stock.

(h) Par value, which is also the amount to which the $4.75 Preferred Stock is entitled on involuntary liquidation.